UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:08-CV-198-F

| | |
|---|---|
| DONNA SABOL, | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   O R D E R |
| | ) |
| HEALTHEXTRAS, INC., | ) |
| Defendant. | ) |

This matter is before the court on the defendant, HealthExtras' ("HealthExtras") Motions to Dismiss [DE-3 and -10], and on the plaintiff, Donna Sabol's ("Sabol") First Motion to Amend/Correct her Memorandum in Support of Response to Motion. *See* [DE-14]. The motions have been fully briefed and are ripe for disposition.

Factual Allegations

In her Complaint,[1] Sabol contends that in 2000, she held a credit card issued by Choice Visa. During that year, she alleges, she was contacted by Choice Visa by telephone, and by HealthExtras, Inc. by direct mail, soliciting her application for a disability insurance policy underwritten by Federal Insurance Company ("Federal"). She contends that she accepted the offer and that Federal issued a policy with the enrollment date of September 1, 2000. That policy, a copy of which Sabol attached to her Complaint as Exhibit A, provides on its Declarations Pages, *inter alia*, that the Policyholder is "Citizens Bank of Rhode Island, as

---

[1] Sabol's original Complaint [DE-1] was filed in state court on March 17, 2008, and removed to this court on April 30, 2008. Sabol filed an Amended Complaint [DE-13] on July 17, 2008. Collectively, these pleadings are referred to as "Complaint."

Trustee for G.A.R.D. Trust for the Account of HealthExtras;" and that the policy is in the amount of $1,000,000. The policy, Exhibit A, does not contain a statement of premiums therefor.

Sabol alleges that payment for the premiums due for the $1,000,000 policy were charged to her Choice Visa card until she received a letter from HealthExtras on March 14, 2001, indicating that there were problems with the credit card billing. *See* Exhibit D to Complaint. The letter states, in pertinent part as follows:

> [A]s of today, we have been unsuccessful in billing the credit card account number we have on file. . . . To avoid interruption or cancellation of your program coverage, please take a moment to complete the notice below and return it to us in the enclosed postage-paid envelope. Or, if you prefer, you may call our Membership Services Department at 1-800-xxx-xxxx.

*Id.* Sabol alleges that she telephoned HealthExtras on March 22, 2001, to arrange for premium payment by personal check, and that HealthExtras agreed.

During that telephone call, the HealthExtras customer service employee allegedly solicited Sabol to increase the policy limit of her Catastrophic Injury and Disability policy to $1.5 million, and Sabol contends that she accepted. By letter dated May 8, 2001, HealthExtras welcomed Sabol to the program. The letter went on to state, in pertinent part,

> For only $95 a year, you have armed yourself with one of the most innovative and affordable disability plan found anywhere in America today. One that will pay you $1,000,000 even if you are eligible for insurance benefits from other services. . . ..
>
> * * * * * * *
>
> P.S. Increase your disability coverage to $1,500,000 for only $35.00 more per year (less than $3 per month). Act now to activate this limited time offer – Just fill out and return the enrollment form or call 1-800-xxx-xxxx,

Exhibit B to Complaint [DE-1, -13]. The Enrollment Form, which bears the instruction, "Please complete, detach, and mail this form today," is still attached to Exhibit B. Sabol's name and address appear to be pre-printed on the form, and the block for "☐ Yes, please increase my coverage to $1,500,000 for an additional $35.00 per year," appears to have been hand-checked. The remainder of the form, however, remains blank.

Sabol alleges that after March 22, 2001, HealthExtras began billing and receiving "payments from Donna Sabol in an amount equal to the policy premium for the $1.5 million" policy. Complaint [DE-1, 13], at ¶ 14. Nowhere in the record can the court locate any statement by Sabol of the dollar figure for the "policy premium for the $1.5 million policy," although she does state in her Response [DE-8] to HealthExtras' Motion to Dismiss that:

> [f]rom the date of Plaintiff's purchase of the $1 million HealthExtras policy until March 2001, Ms. Sabol paid $9.95 per month in premiums. Complaint at § 9, Exhibit E. This premium amount was *also consistent* with the amount which would have been required for the $1.5 million policy if paid on a monthly basis. Complaint at ¶¶ 10 [sic], Exhibit C.[2]

Response [DE-8] at p. 6.

Sabol also attached to her Complaint a letter, designated Exhibit E, dated January 26, 2008, purportedly from HealthExtras, that states, in pertinent part, as follows:

> Dear Donna Sabol:
>
> Thank you for your recent inquiry regarding the accident Protection Plan. Following is the payment history for your enrollment in the Plan:

---

[2] Exhibit C to the Complaint is a copy of a solicitation to Sabol by *American Express Cards* to enroll in a $1.5 million catastrophic accidental disability plan "[f]or only $9.95 a month." Of course, American Express's solicitation has no bearing on the terms of Choice Visa's offer, even if both policies allegedly were administered by HealthExtras. *See* Exhibit C to Complaint [DE-1, -13, at p. 2 (fine print).

| Dates of Coverage | Amount Paid | Date Payment Processed |
|---|---|---|
| 09/01/2000 - 09/30/2000 | $ 9.95 | 09/28/2000 |
| 10/01/2000 - 10/31/2000 | $ 9.95 | 10/30/2000 |
| 11/01/2000 - 11/30/2000 | $ 9.95 | 11/30/2000 |
| 12/01/2000 - 05/31/2001 | $59.70 | 05/04/2001 |
| 06/01/2001 - 05/31/2002 | $95.00 | 06/15/2001 |
| 06/01/2002 - 05/31/2003 | $95.00 | 09/02/2002 |
| 06/01/2003 - 05/31/2004 | $95.00 | 09/05/2003 |
| 06/01/2004 - 05/31/2005 | $95.00 | 09/30/2004 |
| 06/01/2005 - 05/31/2006 | $95.00 | 08/15/2005 |

Exhibit E to Complaint [DE-1, 13] (emphasis added). Sabol cites this Exhibit E in her memoranda for the proposition that she made payments after March 22, 2001, in the amount of the premiums due for the upgraded, $1,500,000 policy.

On April 8, 2002, Sabol, who then was living in Las Vegas, Nevada, was seriously injured in an automobile accident in that state. Tragically, her injuries left her permanently disabled. Her claim under the HealthExtras disability policy initially was denied by Federal. Sabol demanded that the parties engage in arbitration, which resulted in a three-day hearing[3] and an award to Sabol and against Federal in the principal amount of $1,000,000. The Arbitrators' Award included the following finding and conclusion:

> [t]he Policy, at all times relevant to this matter, provided a $1 million (not $1.5 million) catastrophic injury and disability benefit. The record showed that Ms. Sabol specifically requested reinstatement of her policy, which had a $1 million limit, after that policy lapsed for nonpayment of premiums, that she thereafter

---

[3] According to the Award of Arbitrators, the hearing occurred over the period August 21 - 23, 2007. *See* Award of Sept. 20, 2007, Exhibit A to [DE-3].

> received multiple documents showing the limits to be $1 million
> and there is no documentation in the record that she ever
> requested or received an increase in coverage until 2006.

Award of Sept. 20, 2007, Exhibit A to Healthextras' Motion to Dismiss [DE-3] at p. 1, ¶ 3. The Award provided also that "this Award is in full settlement of all claims and counterclaims submitted to this Arbitration." *Id.* at p. 3.

An issue fully litigated and decided during arbitration was the dollar amount of the subject disability policy. Federal contended, and all documentation supplied to the arbitrators supported a finding, that the benefit limit was $1,000,000. However, Sabol contended that she directed that the limit be increased to $1,500,000 during a telephone conversation on March 22, 2001, with a customer service representative of HealthExtras. She contends that she thereafter paid the premium corresponding to the increased benefits limit of $1.5 million. As noted above, however, Sabol never suggests that the premium amount was anything other than $95.00. Finding the existence of "no documentation in the record that she ever requested or received an increase in coverage until 2006," the arbitrators specifically found as a fact in September 2007, that on the date of Sabol's accident, the policy limit was $1,000,000 – "not $1.5 million."

Notwithstanding the $1,000,000 Award made "in full settlement of all claims and counterclaims submitted to this Arbitration," Sabol filed suit six months later in the General Court of Justice, Superior Court Division, Wake County North Carolina, against HealthExtras, Inc. *Sabol v. HealthExtras, Inc.*, No. 08CV004641. Sabol sought damages against HealthExtras in a sum in excess of $10,000 for alleged breach of contract, fraud, breach of fiduciary duty, unfair and deceptive trade practices, plus punitive damages, costs and attorney's fees, alleging, *inter alia*, that:

5

> [A]t some time in 2006 after the receipt of notice of representation
> [by counsel] of Donna Sabol, HealthExtras conspired with Federal
> Insurance Company by noting various digital files and
> acknowledging the request to increase the policy limit amount to
> $1.5 million four years after Ms. Sabol's debilitating accident in
> order to buttress and substantiate Federal's position that Ms. Sabol
> had not increased her policy limit to $1.5 million in March 2001
> prior to her accident.

Complaint [DE-1 ¶ 27; DE-13 ¶ 25]. HealthExtras removed the lawsuit to this court on grounds of diversity of citizenship, on April 30, 2008 [DE-1]. After HealthExtras moved to dismiss this action [DE-10], Sabol filed her Amended Complaint [DE-13] on July 17, 2008, without objection by HealthExtras.

By motion [DE-14] filed January 12, 2009, Sabol seeks an order permitting her to file an amendment to her memorandum [DE-15] opposing HealthExtras' dispositive motion. Specifically, Sabol claims in her affidavit attached to her motion to amend, that in late December 2008 (six months after filing this action), she visited her home in Las Vegas and discovered,

> 3. [T]he original check (Bank of America Check No. 224, a true and
> accurate copy of which is attached hereto as Exhibit A) that I sent
> to HealthExtras to ensure that my disability policy was increased
> from one million dollars($1,000,000) to one million five hundred
> thousand dollars ($1,500,000).
>
> 4. The writing on the "For" line, including the "1.5" that is circled,
> was written by me at the time I wrote the check to indicate that the
> check was intended to pay for the increase of my disability policy
> from one million dollars ($1,000,000) to one million five hundred
> thousand dollars ($1,500,000).

Sabol's January 9, 2009, Affidavit, Exhibit A to [DE-15].

A photocopy of Bank of America check number 224, drawn on Sabol's account, dated April 22, 2001, and Bates-stamped #02244, in the amount of $95.00, had been produced

during discovery in the arbitration proceeding.[4] However, that Bates-stamped photocopy of check 224 lacked the circled "1.5" notation in the "for" line. The photocopy of the "newly-discovered *original*" check 224 (bearing the encircled "1.5" in the "for" line), and the photocopy of the Bates-stamped check 224 produced during arbitration unquestionably depict the same check, except that the earlier-produced check does not bear the encircled "1.5."

In opposition to Sabol's Motion to Amend [DE-14], HealthExtras contends that Sabol and/or her attorney have tampered with the "newly-discovered original check" 224, purportedly discovered by Sabol during her December 2008 visit to her home in Las Vegas. In response, Sabol has filed the Affidavit of questioned document examiner Haywood Starling, who opined,

> 10. It is my opinion that to a reasonable degree of certainty that the "year payment 1.5" ("1.5" writing encircled) written on the "For" line on check number 224 was prepared by the same writing instrument used to prepare all the other writing on the check and that *all writing was prepared by Donna Sabol.*

Starling Affidavit [DE-19], ¶ 10 (emphasis added). Starling did not express an opinion whether the encircled "1.5" was written *at the same time* as the other writing on "newly discovered original check" 224.

---

[4] Counsel for Federal during the arbitration proceeding, Celeste T. Jones, has supplied her affidavit averring, *inter alia*, that in March 2007, Sabol's lawyer produced documents bearing Bates labels 00001-02335 in response to Federal's Request for Production of Documents. Ms. Jones relates that these documents included Document 02244 – Sabol's check number 224, dated April 22, 2001, for $95.00. That document was a photocopy of the front and the back of a check. The document produced in arbitration as Bates number 02244 did not contain the encircled inscription "1.5" on the "for" line.

Sabol's attorney responded to this assertion in Sabol's Reply [DE-18], stating without citation or other reference, that on April 30, 2007, Federal's arbitration defense counsel, Mr. Alan Singer, inspected all original documents in Sabol's counsel's possession at the latter's office, and took high resolution photographs of all those documents. "The original check number 224 was not among those documents." Plaintiff's Reply [DE-18] at p. 3.

HealthExtras' Motions to Dismiss [DE-3 and -10], and Sabol's Motion to Amend or Correct her Memorandum in Support of her Response [DE-14] are ripe for disposition. Sabol apparently seeks to have the court take into consideration her "newly discovered evidence" in deciding HealthExtras' pending dispositive motions.

## Standard of Review

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint. *See Randall v. United States*, 40 F.3d 518, 522 (4th Cir. 1994). In ruling on a motion to dismiss, the district court must consider whether the allegations contained in the complaint constitute a short and plain statement of the claim showing that the pleader is entitled to relief. See *Republican Party of North Carolina v. Martin*, 980 F.2d 943 (4th Cir. 1992). Recently, the United States Supreme Court clarified the standard by holding that a plaintiff must plead "enough facts to state a claim for relief that is plausible on its face," as opposed to merely conceivable on some undisclosed set of facts. *Bell Atlantic Corp. v. Twombly*, 550 U.S. ___, 127 S. Ct. 1955, 1974 (2007). Specifically, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at ___, 127 S. Ct. at 1964-65 (internal citations omitted).

In considering a Rule 12(b)(6) motion, the court is required to accept as true all well-pleaded allegations, *see Albright v. Oliver*, 510 U.S. 266, 268 (1994), and then view such well-pleaded allegations in the complaint in a light most favorable to the plaintiff, *see Lambeth v. Bd. of Comm'rs of Davidson County*, 407 F.3d 266, 268 (4th Cir. 2005). However, the court is not required to accept as true "a legal conclusion couched as a factual allegation," *Papasan v.*

*Allain* 478 U.S. 265, 286 (1986), or " 'to accept as true allegations that contradict matters properly subject to judicial notice or by exhibit,' " *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

### Analysis

The pleading that is the subject of HealthExtras' motion is Sabol's Complaint [DE-1, -13]. According to HealthExtras' Reply [DE-11], the Amended Complaint [DE-13] adds only one new allegation to the original Complaint [DE-1] – that no contract existed between Sabol and Federal requiring arbitration of any dispute. Exhibits A through G attached to Sabol's Amended Complaint are the same as those bearing the same designation attached to the original Complaint.[5] The common law causes of action Sabol purports to state in each version of her Complaint are:

1) Vicarious Liability
2) Breach of Fiduciary Duty
3) Negligence, Failure to Procure Insurance
4) Breach of Contract as Insurance Agent
5) Fraud
6) Constructive Fraud
7) Unfair and Deceptive Trade Practices
8) Punitive Damages

Sabol's theory underlying all these claims is that HealthExtras negligently and/or intentionally and/or fraudulently mishandled Sabol's instruction, made by telephone on March 22, 2001, to HealthExtras' customer service representative, to increase her coverage from $1,000,000 to $1,500,000. Sabol contends that such conduct renders HealthExtras liable to her for damages resulting from its failure to have her disability policy limit increased to $1,500,000 prior to the date of her accident in April 2002. In support of her position, Sabol contends that

---

[5] Exhibits H & I to the Amended Complaint are not material to the instant inquiry.

she paid the increased premium for the higher coverage after March 2001.

Sabol alleges that, by virtue of written and verbal correspondence with HealthExtras concerning the disability policy, an implied contract was created by which HealthExtras became her "insurance agent," and therefore owed her a fiduciary duty. She contends that she placed "special faith, confidence and trust" in HealthExtras employees to represent her interests by increasing the policy limits as she had directed by telephone on March 22, 2001. *See* Amended Complaint [DE-1, 13] at ¶ 41. She further alleges that HealthExtras' "representative or agent . . . undertook to procure insurance of $1.5 million" on her behalf, but neglected to notify her when it failed to do so. Amended Complaint [DE-13] at ¶¶ 46 & 47. Additionally, she claims that HealthExtras conspired with Federal (the defendant in the arbitration proceeding) in 2006 to generate paperwork to create the appearance that Sabol's coverage had been increased to $1,500,000 four years *after* Sabol's debilitating accident. See Amended Complaint [DE-13] at ¶ 25 & Exhibit G.

HealthExtras contends in its motion to dismiss that Sabol's own exhibits to her Complaint plainly contradict her contention that she paid for coverage over $1,000,000. HealthExtras further contends that the "issue" whether the policy limits were $1,000,000 or $1,500,000 already was decided in arbitration and may not be re-litigated here. Therefore, HealthExtras argues, because the premise upon which all Sabol's claims are based has been decided against her, as confirmed by her own exhibits, Sabol's Amended Complaint must be dismissed for failure to state a claim upon which relief may be granted. Rule 12(b)(6), FED. R. CIV. P.

HealthExtras correctly points out that even assuming Sabol's "newly discovered original check" 224 bearing the encircled notation "1.5" were determined to be authentic and

appropriate for the court's consideration in ruling on the motions to dismiss, the motions must be allowed. Specifically, Exhibit B -- the May 8, 2001, HealthExtras letter to Sabol welcoming her to the disability insurance program -- confirms that her $95 yearly premium buys a policy that "pay[s] you $1,000,000 even if you are eligible for insurance benefits from other services." In the same letter, next to a photograph of Christopher Reeve, the late disabled actor who was promoted as spokesperson for the policy, appears the following: "P.S. Increase your disability coverage to $1,500,000 for only $35.00 more per year (less than $3 per month). Act now to activate this limited time offer -- Just fill out and return the enrollment form or call" the toll-free number listed. Neither the Bates-stamped check 224 produced and used in the arbitration proceedings, nor the "newly discovered original check" 224 is drawn for "$35.00 more" than the $95.00 annual premium for $1,000,000-worth of coverage. Nowhere in her Complaint, her affidavit, or any of her memoranda does Sabol state the specific dollar amount of the premiums she contends were due and paid for the increased coverage of $1.5 million.

Even if the court were to allow Sabol's motion to amend by adding her affidavit and copy of the "newly discovered original check" 224 to her memorandum opposing HealthExtras' motion to dismiss, such amendment would not affect this court's analysis whether *her Complaint states a claim* pursuant to Rule 12(b)(6). Exhibits to a memorandum opposing a 12(b)(6) motion to dismiss are not documents contained a "Complaint," which, of course, is the subject of such a motion.

Although Sabol's Motion to Amend [DE-14] her memorandum to add her own affidavit and the appended copy of the "newly discovered original check" 224 is ALLOWED, so also are HealthExtras' Motions to Dismiss [DE-3 and -10] pursuant to Rule 12(b)(6). Sabol's own evidence, attached as Exhibits B and E to her Complaint, flatly contradicts her allegations

that she paid the additional premium ($35.00 per year) for the $1,500,000 increased coverage disability policy. Rather, the documents Sabol elected to append to her Complaints support HealthExtras' contention that the annual premium for the $1,000,000 policy was $95.00, and that Sabol never paid more than $95.00 for any year prior to August 15, 2006.

This court declines to accept as true allegations of the Complaint that are contradicted by the plaintiff's own exhibits to that Complaint. *See Veney*, 293 F.3d at 730. Absent well-pleaded allegations that she paid the required premiums for $1,500,000 in increased disability coverage, Sabol's Complaint fails to state a claim under any of the eight causes of action purportedly stated therein. Accordingly, both Sabol's Motion to Amend [DE-14] and HealthExtras' Motions to Dismiss [DE-3, -10] are ALLOWED.

The allegations of evidence tampering and/or alteration will be referred to the Office of the United States Attorney for the Eastern District of North Carolina for whatever action, if any, that office deems appropriate.

SO ORDERED.

This, the 16th day of July, 2009.

_____
JAMES C. FOX
Senior United States District Judge